**Manuel GOMEZ, et al.**

v.

**Maurice T. TURNER, Jr., Chief of Police, Appellant.**

**No. 81–1559.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 9, 1981.

Decided Feb. 26, 1982.

Richard B. Nettler, Asst. Corp. Counsel, with whom Judith W. Rogers, Corp. Counsel, Charles L. Reischel, Deputy Corp. Counsel, and Michael E. Zielinski, Asst. Corp. Counsel, Washington, D. C., were on the brief, for appellant.

Keith S. Watson, with whom Daniel L. Koffsky, Arthur B. Spitzer, Nancy Pyeatt, Charles A. Patrizia, and Cynthia A. Lewis, Washington, D. C., were on the brief, for appellees.

Charles F. C. Ruff, U. S. Atty., John A. Terry, and Michael W. Farrell, Asst. U. S. Attys., Washington, D. C., were on the brief for, amicus curiae United States, urging reversal.

Before WRIGHT, TAMM and EDWARDS, Circuit Judges.

Opinion for the court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

The issue presented in this case is whether a police officer who approaches and asks a pedestrian for identification, without a reasonable suspicion of criminal conduct, has "seized" that person within the meaning of the fourth amendment.[1] Because we find that such conduct, without more, is not a seizure, we vacate the injunction entered by the district court and remand the cause for further proceedings.

## I. BACKGROUND

This action, which is before the court for the fourth time, arises from a complaint filed over fourteen years ago by Manuel Gomez alleging that the officers of the Metropolitan Police Department of the District of Columbia (MPD) routinely engage in unlawful and unconstitutional behavior during police-initiated encounters with pedestrians. The facts that led to the filing of the original complaint are set out in some detail in the prior opinions of this court. *See Gomez v. Wilson*, 477 F.2d 411 (D.C.Cir.1973); *Gomez v. Wilson*, 430 F.2d 495 (D.C.Cir.1970); *Gomez v. Layton*, 394 F.2d 764 (D.C.Cir. 1968). For purposes of this appeal, it suffices to say that the current thrust of the *Gomez* complaint is that Gomez and the members of the class he represents have been, and will continue to be, approached and asked questions by police officers who lack any articulable basis for believing that

---

**1.** The fourth amendment provides in pertinent part: "The right of the people to be secure in their persons . . . against unreasonable . . . seizures, shall not be violated . . . ." U.S.Const. amend. IV.

a crime has been, is being, or is about to be committed. Consequently, appellees complain that their fourth amendment right to personal security has been violated—they are not free "to walk upon the streets of the Nation's Capital without police harassment." Brief for Appellees at 2.

## A. *General Order 304.10 and "Contacts"*

In 1973 the MPD promulgated General Order 304.10 [2] for the purpose of "[establishing] policies and procedures ... governing police-citizen 'contacts,' stops, frisks, and motor vehicle spot checks." Metropolitan Police Department General Order 304.-10, effective July 1, 1973 (revised August 13, 1978) at 1 [hereinafter *General Order*]; Joint Appendix (J.A.) at 484–500. The General Order has been revised from time to time to reflect changes in the law and to clarify sections of the order that have proved confusing to the MPD officers. [3]

The portion of the General Order dealing exclusively with "contacts" provides in pertinent part:

> A. *Contacts.*
>
> Conduct by an officer which places him in face-to-face communication with an individual under circumstances in which the individual is free to leave if he wishes is considered a "contact." Contacts may be initiated by an officer when he reasonably believes that investigation of a situation is justified. The standard for a police citizen-contact [sic] is not "probable cause," "reasonable suspicion," or any

other specific indication of criminal activity. While an officer may initiate a contact for any legitimate purpose, contacts shall not be conducted in a hostile, aggressive manner, or as a means of harassing individuals or coercing them to leave the area. Contacts shall not be initiated merely because a person is "hanging around," "loitering," or "standing on the corner," unless the overall circumstances are such as would reasonably arouse the curiosity, concern, or suspicion of the officer.

> 1. Initiating a Contact.
>
> An officer may initiate a contact with a person in any place in which the officer has a right to be....

> 2. Conduct of Contacts.
>
> Persons "contacted" may not be detained against their will or frisked. They may not be required to answer the officer's questions or in any way respond to the officer if they choose not to do so. The officer may not use force or coercion to attempt to require citizens to stop or respond. If they refuse to co-operate, they *must* be permitted to go on their way; however, if it seems appropriate under the circumstances, they may be kept under surveillance. Since a contact is *not* a stop or an arrest and the person contacted may be innocent of wrongdoing of any kind, officers should take special care to act in as restrained and courteous a manner as possible.

**2.** A "General Order" is apparently a directive issued by the Metropolitan Police Department of the District of Columbia (MPD) to all officers setting out MPD policy and procedures on specific topics. The parties do not discuss the origins of MPD General Orders, and we are unable to locate any background material in the record that discusses either generally or specifically the procedures used in promulgating a General Order.

**3.** Several versions of the General Order involved in this case, Metropolitan Police Department General Order 304.10, effective July 1, 1973 (revised Aug. 13, 1978) [hereinafter *General Order*], are reprinted in the Joint Appendix (J.A.): the original version, approved June 25, 1973, J.A. at 103–120; a version revised March 11, 1976, J.A. at 471–82; and the version which

is the subject of this appeal, revised August 13, 1978, J.A. at 484–500.

The General Order has been revised again to reflect the clarification in the law contained in the Supreme Court decision in *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), which held that random motor vehicle spot checks violated the fourth amendment. *See* Second Amended and Supplemental Complaint at 2, *Gomez v. Jefferson*, Civ. No. 2909–67 (D.D.C. May 13, 1981, as amended May 18, 1981) [hereinafter *Gomez v. Jefferson*]; J.A. at 141, 142 and Answer of Defendant Jefferson at 2, *Gomez v. Jefferson*, J.A. at 168, 169. This most recent revision deleted the portions of the General Order dealing with motor vehicle spot checks and has no impact on this case.

*General Order* at 1–2; J.A. at 484–85 (emphasis in the original). In contrast, the General Order defines a "stop" as

> the temporary detention of a person for the purpose of determining whether probable cause exists to arrest that person. A stop occurs whenever an officer uses his authority to compel a person to halt, or to keep him in a certain place, or to require him to perform some act (such as walking to a nearby location where the officer can use a radio, telephone or call box). If a person is under a reasonable impression that he is not free to leave the officer's presence, a "stop" has occurred.

*Id.* at 2; J.A. at 485. There is a basis for a stop if "[the] officer *reasonably suspects* that a person has committed, is committing, or is about to commit any crime. . . ." *Id.* (emphasis in the original).

Both types of police-citizen encounters are recorded on a "PD Form 76," an MPD form that provides space for recording the name, address, race, sex, date of birth, height, weight, eye and hair color, complexion and clothing of the person encountered. In addition, there is a section in which the officer is to record the justification for the stop or contact. Officers are required to maintain records of stops; records of contacts, however, are not mandatory, but may be required by individual commanding officers. *Id.* at 16; J.A. at 499. Excluding encounters that result in formal arrests,

MPD officers record approximately 14,000 police-citizen encounters per year.[4]

In March 1980, the *Gomez* plaintiffs filed an amended and supplemental complaint for declaratory and injunctive relief alleging, *inter alia*, that "[w]hen a police officer "contacts" a pedestrian pursuant to General Order 304.10 or any other MPD order authorizing such behavior, the officer is making an unreasonable seizure of the pedestrian in violation of the Fourth Amendment." Second Amended and Supplemental Complaint at 1, *Gomez v. Jefferson*, Civ. No. 2909–67 (D.D.C. May 13, 1981, as amended May 18, 1981) [hereinafter *Gomez v. Jefferson*]; J.A. at 141, 153. Thereafter, both parties moved for summary judgment.

## B.  The District Court Order

On May 13, 1981, the district court partially granted appellees' motion for summary judgment and held that the MPD policy and practice of making "contacts" without an articulable basis for concluding that the person "contacted" has committed, is committing, or is about to commit a crime is "an unlawful intrusion upon personal privacy and violative of the Fourth Amendment of the United States Constitution." Memorandum Order at 1, *Gomez v. Jefferson*; J.A. at 755.[5] The court defined "contacts" as "investigative interrogations asking pedestrians to identify themselves or account for their presence on the public streets . . . ." *Id.*; J.A. at 755.[6] The de-

---

4. For the twelve month period beginning November 30, 1978 and ending December 1, 1979 (sample year), the MPD recorded 14,300 encounters. Stipulation I at attachment, *Gomez v. Jefferson*; J.A. at 463–65. The parties have stipulated that the figures for the sample year fairly represent the proportion of recorded contacts and stops to total encounters that are typical for the years 1974 to 1979. *Id.* at 1; J.A. at 463.

   Review of the PD Form 76 cards for the sample year disclosed the following statistics:

| Total Encounters | Recorded as Contact | Recorded as Stop | Recorded as Contact & Stop | No Category Marked |
|---|---|---|---|---|
| 14,300 | 7,080 | 5,040 | 347 | 1,833 |
| 100% | 49.5% | 35.3% | 2.4% | 12.8% |

   *Id.* at attachment; J.A. at 465.

5. Although the constitutionality of the MPD's practice of effectuating "stops" was challenged

also, *see* Second Amended and Supplemental Complaint at 3, *Gomez v. Jefferson*; J.A. at 143, the district court order affects only the policy, procedures, and actual police practice concerning "contacts." An order granting partial summary judgment is usually considered a nonappealable interlocutory order. *See* 6 Pt. 2 J. Moore & J. Wicker, Moore's Federal Practice § 56.20[4] (2d ed. 1976). Because the subject order granted an injunction, however, this appeal is properly before us pursuant to 28 U.S.C. § 1292(a)(1) (1976).

6. As originally issued, the district court's order defined contacts as "investigative interrogations requiring pedestrians to identify themselves . . . ." Memorandum Order at 1 & 2, *Gomez v. Jefferson*; J.A. at 755–56. An amendment on May 18, 1981, replaced the word "requiring" with the word "asking." Order, *Gomez v. Jefferson*; J.A. at 769.

fendant Chief of Police [7] was enjoined from "authorizing or effectuating any 'contacts' " and was directed to draft for court approval an order directing MPD officers to cease all acts encompassed by the injunction. *Id.* at 2; J.A. at 756. The court further ordered that "General Order 304.10 and any other order, directive or authority inconsistent with [the court-approved directive] shall be rescinded." *Id.*; J.A. at 756. This appeal followed.

## C. *Contentions of the Parties*

A "seizure" occurs "[o]nly when [an] officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen . . . ." *Terry v. Ohio*, 392 U.S. 1, 19 n.16, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). The parties agree that whether a person has been "restrained" must be determined by reference to an objective standard and that the test in this circuit is " '[whether] a reasonable [person], innocent of any crime, would have thought [he was free to leave] had he been in the defendant's shoes.' " *United States v. Wylie*, 569 F.2d 62, 68 (D.C.Cir.1977) (quoting *Coates v. United States*, 413 F.2d 371, 373–74 (D.C.Cir.1969)), *cert. denied*, 435 U.S. 944, 98 S.Ct. 1527, 55 L.Ed.2d 542 (1978). Appellant and appellees part company, however, over the question whether the conduct authorized in General Order 304.10, and specifically a request for identification,[8] constitutes, in the mind of the reasonable person, such a restraint on liberty.

Appellant argues quite simply that "contacts" as defined by General Order 304.10 are not "seizures." The thrust of appellant's argument is that courts using the reasonable person test—particularly this court—have found no seizure in a variety of situations where officers approached and directed questions to pedestrians, including requests for identification. Consequently, General Order 304.10, which authorizes no more, cannot be facially invalid. Whether particular conduct constitutes a seizure, it is argued, must be determined on a case-by-case basis.

Appellees, on the other hand, argue that no reasonable person asked to produce identification would feel free to refuse to answer or to leave the presence of a police officer. Therefore, appellees contend, such police conduct must constitute a seizure, and General Order 304.10, which authorizes contacts without an articulable basis, including requests for identification, is facially invalid.

## II. ANALYSIS

The Supreme Court has noted that "[p]eople are not shorn of all Fourth Amendment protection when they step from their homes onto the public sidewalks." *Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660 (1979). The fourth amendment is not implicated, however, unless there is a "seizure" and the seizure is unreasonable. This case requires us to determine whether a "seizure" occurs when the MPD "contacts" a pedestrian.[9]

---

**7.** Maurice T. Turner, Jr., is the current Chief of Police of the Metropolitan Police Department of the District of Columbia.

**8.** Although the district court order enjoined investigative interrogations "asking pedestrians to identify themselves or account for their presence on the public streets," *see* note 6 and accompanying text, for ease of reference, throughout the remainder of the opinion we will refer to a "request for identification" or "an accounting of presence on the public streets" simply as a "request for identification."

**9.** Appellant suggests that an MPD contact, even if a seizure, "constitutes such a minor intrusion upon a pedestrian's privacy that it

need not be justified by a reasonable, articulable suspicion of criminal conduct, much less probable cause, and such questioning is proper as long as it is not wholly capricious." Brief for Appellant at 9–10 (footnote omitted). The Supreme Court has recognized that brief, relatively unintrusive detentions—termed "stops" —may be "reasonable" if based upon an articulable suspicion. *See, e.g., Brown v. Texas*, 443 U.S. 47, 50, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979); *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972). More intrusive detentions are reasonable only if supported by probable cause. *See Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). The law is unsettled concerning the point at which a "stop" ripens into

The starting point in any case dealing with an alleged "seizure" that does not technically amount to an arrest must be the seminal case of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).[10] In *Terry*, the Court found that "whenever a police officer *accosts* an individual *and restrains* his freedom to walk away, he has 'seized' that person," *id.* at 16, 88 S.Ct. at 1877 (emphasis added), and noted that "[o]bviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons." *Id.* at 19 n.16, 88 S.Ct. at 1879. The Court further instructed that it is "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen [that a court may] conclude that a 'seizure' has occurred." *Id.*

More recently, in *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), Justice Stewart, joined only by Justice Rehnquist, reiterated the *Terry* seizure standard and espoused the following test to determine whether a "restraint" has been imposed: "only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* at 553–54, 100 S.Ct. at 1876–1877 (opinion of Stewart, J.) (footnote omitted). Without evidence of some show of authority, however, Justice Stewart felt that "otherwise

inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person." *Id.* at 555, 100 S.Ct. at 1877. Under the facts presented in that case, Justice Stewart concluded that Mendenhall had not been seized when two federal Drug Enforcement Agents approached her in an airport and requested identification. *Id.* A majority of the Court, however, did not reach the seizure issue.[11]

The issue is not a new one in this circuit. In *Coates v. United States*, 413 F.2d 371 (D.C.Cir.1969), we were concerned with whether police officers' initial approach of suspects constituted an arrest. There we noted that " 'the test must not be what the defendant himself * * * thought, but what a reasonable man, innocent of any crime, would have thought had he been in the defendant's shoes.' " 413 F.2d at 373 (quoting *United States v. McKethan*, 247 F.Supp. 324 (D.D.C.1965)). In addition, we stated that "[a] police officer by merely engaging in conversation with a citizen does not thereby create the requisite restraint on liberty which would constitute an arrest." 413 F.2d at 374 (footnote omitted).

More recently, in *United States v. Wylie*, 569 F.2d 62 (D.C.Cir.1977), the question concerned whether an officer's approach of a person and question, "Sir, may I talk to you a moment?" accompanied by the officer's

a detention that requires probable cause. In any event, the Court has stated that "any curtailment of a person's liberty by the police must be supported *at least* by a reasonable and articulable suspicion that the person seized is engaged in criminal activity." *Reid v. Georgia*, 448 U.S. 438, 440, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam) (emphasis added). *Accord United States v. White*, 648 F.2d 29, 33 (D.C.Cir.1981), *cert. denied*, — U.S. —, 102 S.Ct. 424, 70 L.Ed.2d 233 (1981); *United States v. Wylie*, 569 F.2d 62, 76 (D.C.Cir.1977), *cert. denied*, 435 U.S. 944, 98 S.Ct. 1527, 55 L.Ed.2d 542 (1978). Accordingly, we decline appellant's invitation to find that a contact, even if a seizure, is reasonable although not based upon *any* recognized objective standard.

**10.** In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Court held that "where a police officer observes unusual conduct which leads him reasonably to conclude in

light of his experience that criminal activity may be afoot and that persons with whom he is dealing may be armed and presently dangerous, . . . a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault [the officer]" is justified. 392 U.S. at 30, 88 S.Ct. at 1884.

**11.** Justice Powell, joined by the Chief Justice and Justice Blackmun, found it unnecessary to reach the seizure issue. Justice Powell noted, however, that he "[did] not necessarily disagree" with Justice Stewart's formulation of the seizure issue and the test espoused. *United States v. Mendenhall*, 446 U.S. 544, 560 & n.1, 100 S.Ct. 1880 (1980) (Powell, J., concurring in part and concurring in the judgment). A case arguably presenting the seizure issue is currently before the Court. *See Florida v. Royer*, 389 So.2d 1007 (Fla.Dist.Ct.App.1981), *cert. granted*, — U.S. —, 102 S.Ct. 631, 70 L.Ed.2d 612 (1981).

use of a PD Form 76 constituted a "stop." The court held that the conduct "constituted a mere 'contact,' and not a compelled investigative stop and therefore did not require reasonable, articulable grounds for suspecting that appellant had committed a crime." 569 F.2d at 66. We noted that "police-citizen communications which take place under circumstances in which the citizen's 'freedom to walk away' is not limited by anything other than his desire to cooperate do not amount to 'seizures' of the person and consequently may be initiated without a reasonable, articulable suspicion, much less probable cause." *Id.* at 67.

Determining whether the facts in *Wylie* resulted in a "stop" or a "contact," required "a refined judgment." *Id.* at 68. The crucial element of the holding in *Wylie* was that the seizure issue is always a fact-bound question. As Judge Robinson, now Chief Judge, so eloquently stated:

> Ofttimes the boundary between voluntary and involuntary on-street colloquy with police officers is elusive. Many people at bottom will think twice before spurning an importuning policeman. This is not to suggest that that circumstance alone makes one inexorably a captive, for if it did no police-citizen investigative contact would ever withstand scrutiny. It is to say that the line of demarcation lies at the point of some different and larger restraint.

*Wylie*, 569 F.2d at 73 (Robinson, J., concurring in part and dissenting in part) (footnotes omitted).

We reaffirm today that in this circuit the test of whether a seizure has occurred is whether a reasonable person, innocent of any crime, would have felt free to walk away under the circumstances.

To decide the case at bar, we must apply this test and answer three questions. First, is it *always* a seizure when a law enforcement officer approaches a person on the street and directs questions to that person? As we explain below, the answer to this question must be no. Second, is it *always* a seizure when a law enforcement officer approaches a person and requests identification? For the reasons detailed below we disagree with the district court and also answer this question in the negative. Third, in light of our resolution of the first two questions, was the record before the district court sufficient to support the conclusion on summary judgment that the MPD contact program, as practiced, shows a pattern of unconstitutional conduct warranting an injunction? We find that this issue is dependent upon material facts that are in dispute, and accordingly we vacate the injunction and remand the cause to the district court for further proceedings.

*A. Is the Approach and Direction of a Question a "Seizure"?*

▪ As noted above, a "seizure" occurs when a police officer, by force or show of authority, restrains the liberty of a citizen. Whether a restraint has occurred is determined, in turn, by reference to the mind of a "reasonable person." Combining the two standards, the ultimate issue is not merely whether a reasonable person confronted by an inquisitive police officer would not feel free to walk away, but more precisely whether such conduct constitutes a *show of authority* that would lead a reasonable person to conclude that he is not free to go.

▪ As a threshold matter, we must recognize that a reasonable person is willing, on occasion, to cooperate with the police. A reasonable person is aware, we believe, of the duties of law enforcement officers not only to apprehend criminals, but to keep the peace and, where possible, to prevent the commission of crime. This awareness, coupled with feelings of civic duty,[12] moral obligation, or simply proper etiquette, will often lead a reasonable person to cooperate

---

12. Although there is, of course, no legal duty to cooperate with law enforcement authorities, we note that "[i]t is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement." *Miranda v. Arizona*, 384 U.S. 436, 477–78, 86 S.Ct. 1602, 1629, 16 L.Ed.2d 694 (1966). A reasonable person, we believe, feels such a responsibility.

with law enforcement officers.[13] Because a variety of factors may contribute to a person's decision to acquiesce to an officer's request, we are unwilling to impute to the reasonable person, as his sole motivation, a fear of official sanction engendered by the mere presence of an authority figure.

It is not argued that an officer's request for the time of day or for information concerning the identity of a lost child would constitute a "show of authority" sufficient to result in a seizure. Nor is it suggested that in emergency situations an officer may not request aid or information from a pedestrian without "seizing" him. Even appellees concede that an officer may approach and question a potential witness without a seizure occurring.[14] In all the foregoing circumstances, there is a police-initiated encounter where a reasonable person stops and answers questions, not out of fear of the police, but in a spirit of cooperation.

The need for questioning as a tool for the effective performance of law enforcement duties is undisputed. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 225, 93 S.Ct. 2041, 2046, 36 L.Ed.2d 854 (1973). Indeed, even a person who has been detained by the police is not presumed to be unwilling to cooperate. The Supreme Court has so held in the context of consent searches. *See, e.g., United States v. Mendenhall*, 446 U.S. 544, 558, 100 S.Ct. 1870, 1879, 64 L.Ed.2d 497 (1980); *Schneckloth*, 412 U.S. at 248, 93 S.Ct. at 2058.

Accordingly, the presence of the officer as a figure of governmental authority does not, by itself, constitute the "show of authority" necessary to make a reasonable person feel unfree to leave. There must be some additional conduct by the officer to overcome the presumption that a reasonable person is willing to cooperate with a law enforcement officer.[15] The approach and direction of a question by a police officer cannot be, as a matter of fact or of law, a seizure of the person so approached.

B. *Is a Police Request for Identification a "Show of Authority" that Restrains a Pedestrian?*

The more difficult question we confront in this case is whether the *nature of the identification question itself,* combined with the fact that the questioner is a police officer, cumulatively creates a sufficient show of authority to constitute a seizure. We hold that the nature of this question alone, without reference to the demeanor of the officer, the tone of voice used, or any other circumstance, cannot convert an otherwise inoffensive encounter into a seizure.

That a request for identification does not, in all cases, constitute a seizure follows from our analysis in the preceding section. It cannot be disputed that in the course of interviewing potential witnesses police routinely request identification information as well as information concerning when and where a potential witness was at a particular time—often at the time a crime was committed or shortly thereafter. Appellees

---

**13.** That such feelings exist in the average person cannot be denied. *See* Model Code of Pre-Arraignment Procedure § 110.1 commentary at 258 (Proposed Official Draft 1975) (many citizens will defer to police authority because they believe in some vague way that they should); L. Tiffany, D. McIntyre, D. Rotenberg, Detection of Crime 17 (1967) ("in high crime areas, particularly, persons who stop and answer questions do so for a *variety of reasons*, including a willingness to cooperate with police, a fear of police, a belief that a refusal to cooperate will result in arrest, or a combination of all three") (emphasis added).

**14.** For example, appellees state that "[t]his case does not concern any interchange between an officer and a pedestrian in which the pedestrian is not asked to identify himself or explain his behavior, *e.g.,* when a pedestrian is asked whether he witnessed a particular crime. In such cases, the pedestrian may feel free to go." Brief for Appellees at 14.

**15.** One noted commentator suggests that because there are moral and instinctive pressures to cooperate with the police, "[a] confrontation would amount to a seizure only if the officer added to those inherent pressures by engaging in menacing conduct significantly beyond that which is accepted in social intercourse." W. LaFave, Search and Seizure, A Treatise on the Fourth Amendment § 9.2 (2d ed. 1978).

have not suggested that they, as mere pedestrians, possess a greater right to be free from police questions concerning identification than a person on the street who may have happened to witness a crime.

Moreover, in *Wylie* this court found that no seizure occurred when an officer approached a person and asked questions, including a request for identification. Although that decision is not dispositive of the case at hand because *Wylie* involved the application of the "seizure" test to specific facts, it must be accorded substantial precedential value. Appellees' argument that this court did not pass upon the constitutionality of a "contact" or the facial validity of that portion of General Order 304.10 in *Wylie* is disingenuous. As noted above, the finding that the officer's initial conduct did not constitute a "seizure" was necessary to our holding in *Wylie*. *See* page 140, *supra*. That finding, in turn, necessarily implied that the "contact" portion of General Order 304.10 was not facially invalid. *See Wylie*, 569 F.2d at 67–68.

Appellees attempt to distinguish the contacts of which they complain from other police-citizen encounters by contending that "when an officer's *questions focus on the pedestrian*—when the officer approaches a pedestrian on the public street, asks for identification or an account of behavior *and records the response* on a police form—the pedestrian does not feel free to leave and therefore has been seized." Brief for Appellees at 14 (emphasis added). Whether a seizure occurs when a question "focus[es] on the pedestrian" and the officer "records the response" is, of course, not the issue in this case. The recording of responses adds a factual circumstance not encompassed by the district court's order.[16] Moreover, the distinction that appellees attempt to make does not withstand analysis.

■ Whether the *question* asked "focuses on the pedestrian" cannot be raised to the level of a legal standard, for a request for identification surely focuses on the person asked whether it be a witness to a crime, a person in distress, or a mere pedestrian. The nature of the question becomes relevant only when viewed in the context of surrounding circumstances. Appellees' true concern appears to be with the *officer's* subjective focus on the pedestrian. In order to provide a workable rule, this court applies an objective standard; accordingly, the intent of the officer or the reason behind his decision to approach a pedestrian cannot be the basis upon which we determine whether a seizure has occurred.[17] This is not to say, however, that a reasonable person will not feel more intimidated when it appears that he is the subject of a police inquiry.

■ The nature of the question asked is a proper factor to be considered in determining whether a seizure has occurred. Nonetheless, we are unwilling to state a categorical rule that a request for identification *always* constitutes a seizure.[18] Such

---

16. The effect that the use of a PD Form 76 during a contact may have on the question of whether a "seizure" occurs, an issue not necessary to our decision, is a matter of serious concern to us. *See* page 145, *infra*.

17. Although the subjective intent of the officer is not relevant to the seizure issue, it is, of course, relevant in other areas of fourth amendment analysis and in other contexts. For example, intent would be relevant to an allegation that the police impermissibly use race or ethnic background as a factor in finding a "reasonable suspicion" to "stop" a pedestrian. In addition, intent would be relevant to an allegation that the practice of "contacting" pedestrians was carried out in a racially discriminatory manner, or used to harass members of particular minority groups.

18. The district court enjoined both "asking pedestrians to identify themselves" and asking them "to account for their presence on the public streets." While we hold that neither type of question constitutes a seizure *per se*, we believe that only in rare circumstances would a pedestrian expect to have to explain, at the request of a police officer, what he or she was doing in a public place. In the absence of an articulable suspicion, it is hard to imagine why the police would need to know such information. A request for identification alone accomplishes most of the legitimate objectives of the contact procedure. Furthermore, we note that pedestrians, unlike drivers, are not required to carry a driver's license or any other formal identification papers with them on their walks. *See Brown v. Texas*, 443 U.S. 47, 52, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357 (1979). That

a rule would prevent an officer from legitimately seeking citizen cooperation, particularly from potential witnesses.

An officer's request for identification, phrased in precatory terms and standing alone, simply is not a "show of authority." It may be that such a request, coupled with other factors, could amount to a seizure— this we cannot determine until presented with a factual background sufficient to render such a judgment. All the facts and circumstances surrounding a police-citizen encounter must be considered—not merely a single question.

█ It is inevitable that in the future both the district court and this court will be called upon to determine whether a particular police-citizen encounter involved an "arrest," a "stop," or a "contact." As we have stressed, such a determination must be considered on the basis of all the circumstances surrounding the encounter. In *Mendenhall*, Justice Stewart suggested that a "show of authority" might include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." 446 U.S. at 554, 100 S.Ct. at 1877. (Opinion of Stewart, J.). In assessing whether a particular police-citizen contact results in a seizure, we believe that the demeanor of the approaching officer, the tone of voice used, the nature of the questions asked, and the time and place of the encounter are among the factors to be considered. The reviewing court must examine the totality of the circumstances and apply its informed judgment to the situation.

On this score, we note that resolution of the seizure question would be a far easier task if the approaching officer clearly informed the subject that he was free to leave and need not answer any questions or produce identification. Such a warning or statement is not, of course, constitutionally required. *See Schneckloth v. Bustamonte*,

412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Although in many cases no single factor can be considered determinative, such a statement would add substantial weight to the argument that a reasonable person, so informed by the police, would have felt free to leave. In view of the persistent problems and continuing litigation police "contacts" with citizens in the District of Columbia have caused, we strongly recommend that the MPD include this statement in its contact procedure and policy.

█ In sum, we hold that a request for identification cannot constitute, as a matter of law, a show of authority sufficient to convert an innocent encounter into a seizure. The "contact" portion of General Order 304.10, which authorizes no more, is not facially invalid.

## C. Does the MPD Practice Warrant the Injunction?

█ Final resolution of this appeal requires us to determine whether the injunction entered by the district court is justified notwithstanding our decision on the seizure issue. In order for the injunction to stand, we must find that the record before the district court was sufficient to support a finding that the practice of MPD "contacts" is carried out in violation of the fourth amendment. Appellees alleged before the district court that the MPD "stopped" pedestrians under the guise of "contacting" them and that "stops" were effected without a reasonable articulable basis for suspecting criminal conduct. The Chief of Police denied both allegations. Because this issue concerns material facts which are vehemently disputed, the issue is not an appropriate one for summary judgment. *See* Fed.R.Civ.P. 56(c). Accordingly, we must vacate the order and remand the case to the district court.

On remand the district court is directed to hold further proceedings to determine whether the MPD practice of "contacting"

citizens can walk the streets, without explanations or formal papers, is surely among the

cherished liberties that distinguish this nation from so many others.

pedestrians is carried out in disregard of their fourth amendment rights. The affidavits filed in support of appellees' motion for summary judgment show that at least some MPD officers engage in conduct that travels far beyond asking a simple question.[19] Moreover, we find other aspects of the contact practice disturbing. Among our concerns is the use of PD Form 76 cards during "contacts." The district court should consider whether the recording of detailed personal information [20] during a police-initiated encounter, coupled with the officer's presence and the nature of the questions involved, may constitute a "show of authority" sufficient to transform the encounter into a seizure.

Although the "contact" portion of the General Order provides that "[i]f they refuse to cooperate, [pedestrians] *must* be permitted to go on their way," *General Order* at 2; J.A. at 485 (emphasis in the original), we are also concerned with the extent to which MPD officers may use a pedestrian's silence or refusal to cooperate during a contact as the sole basis for finding "reasonable suspicion" to "stop" that person. If an officer can detain a person, by force if necessary, simply because that person exercises his right to refuse to cooperate or answer questions, his freedom to walk away is indeed no freedom at all. This is not to say, of course, that officers may not consider a pedestrian's answers or reactions during a contact, in conjunction with other factors, as an element contributing to the conclusion that there is a "reasonable suspicion" that the pedestrian has committed, is committing, or is about to commit a crime.[21] Accordingly, on remand the district court should also consider whether the MPD impermissibly uses a pedestrian's silence or refusal to cooperate during a contact as the *sole justification* for seizing that person.[22]

---

**19.** On motion for summary judgment, appellees submitted affidavits detailing police encounters and the PD Form 76 cards completed by the officers involved. Many of the encounters characterized by the police as "contacts" raise serious questions concerning the propriety of the police conduct. *See, e.g.,* Affidavit of George D. Sitgraves, *Gomez v. Jefferson*; J.A. at 397–99 (officer drew gun; 6–8 other officers arrived; encounter lasted for one-half hour); Affidavit of Kevin G. Robinson, *Gomez v. Jefferson*; J.A. at 404–05 (subject frisked and told he would be arrested if he continued to run down the street); Affidavit of Ronald Eric McIntyre, *Gomez v. Jefferson*; J.A. at 346–47 (subject told not to leave and threatened with trip to the precinct; encounter lasted 2 hours).

**20.** See page 5, *supra.*

**21.** The portion of the General Order concerning "stops" provides in part:

Reasonable suspicion is a combination of specific and articulable facts, together with reasonable inferences from those facts, which, in light of the officer's experience, would justify a reasonable officer in believing that the person stopped had committed, was committing, or was about to commit a criminal act.

... [S]*ome of the factors* which may be considered in determining whether "reasonable suspicion" exists [include]:

. . . . .

d. Demeanor During a Contact:

(1) *If the person responds* to inquiries during a contact, does he give evasive, suspicious, or incriminating replies?

(2) Is he *excessively* nervous during the contact?

*General Order* at 3–4; J.A. at 486–87 (emphasis added). We assume, without deciding, that this portion of the General Order correctly sets forth the extent to which a pedestrian's reactions during a "contact" may be considered by an officer in assessing whether reasonable suspicion exists. It is not at all clear from this portion of the text, however, that an officer may not use silence or refusal to cooperate as the sole basis for the assessment. Clarity in this context is both desirable and possible. For example, in the portion of the General Order concerning an officer's conduct during a "stop," it is carefully noted: "Neither refusal to answer questions nor to produce identification *by itself* establishes probable cause to arrest . . . ." *General Order* at 7; J.A. at 490 (emphasis added). The "stop" portion of the General Order is not, of course, before us in this appeal; accordingly, our comments should not be considered approval or disapproval of the standards set forth therein.

**22.** Although it is not clear from the record that MPD officers engage in this practice, we note that the MPD cards surveyed indicated some encounters characterized as both a "contact" and a "stop." *See* note 4, *supra.* There is at least an implication that these encounters began as contacts and escalated into stops.

If it is found that the MPD engages in conduct, masquerading as contacts, that results in the seizure of pedestrians without an articulable basis, the court shall determine whether there exists in the District of Columbia a pervasive pattern of such unconstitutional conduct. *See Rizzo v. Goode,* 423 U.S. 362, 371, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). If such a pattern exists, the court must determine what relief is warranted by the scope of the violation. *See Rizzo,* 423 U.S. at 378; *Allee v. Medrano,* 416 U.S. 802, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974). "The task is to correct, by a balancing of the individual and collective interests, the condition that offends the Constitution." *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 16, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). Some limited prophylactic measures might suffice to cure whatever unconstitutional practice may exist, with less intrusion into legitimate police functions than a blanket injunction of the type issued below. Before imposing another judicial remedy, the court should also consider the effectiveness of any official corrective actions taken as a result of this opinion. *See Washington Mobilization Committee v. Cullinane,* 566 F.2d 107, 130 (D.C.Cir.1977) (statement of Leventhal, J.).

### III. CONCLUSION

In conclusion, we find that the nature of a police officer's question to a pedestrian is but one factor that should be considered in determining whether a person has been "seized." The presence of that factor alone, however, does not normally constitute a "show of authority" that leads a reasonable person to conclude that he is not free to go. Accordingly, a police request for identification does not always result in a seizure of the questioned person. To suggest otherwise would prevent an officer from inquiring whether a person who appears to be in distress needs help, from questioning potential witnesses, and from seeking the voluntary cooperation of citizens. Every police-initiated encounter must be considered in light of all the relevant facts and circumstances. Accordingly, the "contact" provision of General Order 304.10, which states that MPD officers can approach pedestrians and ask questions, is not facially invalid.

Because the express policy of the MPD is not unconstitutional, the remaining issue in this case, whether the police conduct in question results in unconstitutional "seizures" of pedestrians, is a disputed question of fact and not a proper subject for action on summary judgment. Accordingly, the order of the district court is vacated, and the case is remanded for further proceedings.

*It is so ordered.*