**UNITED STATES of America,**

v.

**Stanley E. WARNER, Defendant.**

**Crim. No. 83–00255.**

United States District Court, District of Columbia.

Oct. 25, 1983.

As Amended Dec. 2, 1983.

Stanley S. Harris, U.S. Atty., Charles J. Harkins, Jr., Asst. U.S. Atty., Washington, D.C., for U.S.

James H. Craddock, Washington, D.C., for defendant.

## MEMORANDUM

OBERDORFER, District Judge.

Defendant was indicted on October 7, 1983, for possession of cocaine and heroin

with intent to distribute. He has moved to suppress the introduction of the drugs into evidence as well as statements he made to an officer of the Drug Enforcement Administration ("DEA") immediately following his arrest. At a hearing on October 20, 1983, the Court heard testimony from the arresting officer and the defendant. An application of current case law to the facts as revealed in that testimony requires that defendant's motions be granted.

## I.

Most of the facts are undisputed. Special Agent Charles H. West of the DEA went to Washington's Union Station late in the evening of September 8, 1983, to assist three agents from the Baltimore DEA office who were on the lookout for a white male whom they suspected of being a drug courier. The agents gathered in the waiting area of the station near the gate where arriving passengers enter the terminal. The agents were dressed in street clothes. All the agents were armed with concealed weapons. One of the weapons was kept in a small handbag. West's weapon was in his belt area and may have bulged so as to be observable.

Around 12:30 a.m., a train from New York pulled into the station—the last train due in that night. The passengers entered the terminal through the gate. West and the other officers did not see the suspect they had expected. They did, however, see the defendant. Defendant, a black male, was casually dressed with his arm in a sling and a small tote bag (similar to that in which one of the officers carried a weapon) tucked between the bandaged arm and his side. He was seen to enter from the gate, walk to a bank of telephones with a companion, wait while the companion began a telephone call, then proceed alone to an exit leading to the taxi stand.

Agent West testified that his observations of the defendant during this period aroused his suspicions that defendant was carrying drugs. When pressed to articulate what it was that aroused his suspicions, Agent West first cited his experience in the DEA and then mentioned a number of factors. The defendant appeared to be nervous because he was constantly looking around and, while exiting the station, occasionally looked back at the agents over his shoulder. The defendant appeared to be with three other black males who separated before leaving the station. Finally, Agent West overheard part of the telephone conversation of defendant's companion after defendant stepped away, and the conversation concerned money. Based on these observations and his experience with narcotics investigations in the DEA, Agent West decided to stop the defendant.

Accompanied by another agent, and with the remaining two agents in sight, Agent West approached the defendant at the taxi stand outside Union Station. According to the testimony, the area was well-lit with an overhanging canopy about twenty feet above and a line of taxis waiting at the curb. As the two agents walked up to the defendant he turned to face them. As indicated, Agent West testified that his gun was concealed under his shirt at his waist, but that a tell-tale bulge may have been visible.

From this stage on the testimony of Agent West and the defendant is contradictory. West stated that his first words to the defendant were "Sir, we are special agents of the DEA [or of the police or the Department of Justice]." He showed his DEA identification card, and then asked "May we look inside that bag you are carrying." According to Agent West, the defendant said "yes" and handed him the bag. West unzipped the bag, saw drugs and drug paraphernalia inside, and told the defendant he was under arrest. West testified that the defendant was immediately read his rights as required by the *Miranda* decision. The defendant stated he understood his rights and then proceeded to explain why the drugs were in his possession.

The defendant's version is somewhat different. He testified that Agent West first asked him for identification. Defendant told West that he had none. Defendant's only possession other than the bag was a

return ticket to New York. Defendant testified that Agent West then said "Let me see that bag" and reached for it. The defendant handed the bag to the agent out of fear that he would otherwise pull it from under his arm, which was in a sling due to pain from a gunshot wound. Defendant denies that he ever consented to the search of his bag. He claims that he was first advised of his rights at the police precinct station, even though he was questioned at the taxi stand at Union Station.

## II.

These facts raise several legal issues. First, did the DEA agents seize the defendant when they approached him near the taxi stand? Second, if they did seize him, did they have a reasonable and articulable suspicion that the defendant was engaged in criminal activity? Finally, was the consent of the defendant, as alleged here, freely and voluntarily given? Accepting the truth of all of Agent West's testimony, the Court concludes that the defendant was seized in the absence of a reasonable suspicion of illegal activity and that his consent was not voluntarily given.

■ It is well-established that, absent probable cause or exigent circumstances, the police may not detain a person unless they have a reasonable and articulable suspicion that he is engaged in some unlawful activity. *Reid v. Georgia*, 448 U.S. 438, 440, 100 S.Ct. 2752, 2753, 65 L.Ed.2d 890 (1980). Of course, a request for identification alone does not constitute a seizure by the police. Rather, the Court must look to all the circumstances to decide whether there has been a show of authority by the police which would convince a reasonable person that he was not free to walk away. *Gomez v. Turner*, 672 F.2d 134 (D.C.Cir. 1982). Applying this standard, the Court concludes that the defendant was seized by Agent West by the time the search of the bag took place. A reasonable person accosted by two officers who produce identification as federal agents, and who are visibly flanked at a distance by two more agents, would conclude that he is not free

to leave when asked the questions posed here. That conclusion would be bolstered by signs indicating that the agents had weapons under their clothing. When one further considers that the defendant had just stepped off a train, with no possessions except a return ticket, in an unfamiliar city where he claims he knew no one, that conclusion seems almost inescapable. It would require an intrepid traveler indeed to conclude that, upon being surrounded by armed agents in an unfamiliar city, he remained free to go on his way. *See United States v. Mendenhall*, 446 U.S. 544, 555, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (Stewart, J.) (circumstances that might indicate a seizure listed, including "the threatening presence of several officers") and *id.* at 560 n. 1, 100 S.Ct. at 1880 n. 1 (Powell, J.).

■ Since the defendant was seized at the time he surrendered his bag to the DEA agents, the government must establish that the agents had a reasonable and articulable suspicion that he was engaged in some criminal activity. The testimony adduced at the hearing fails to meet that standard. As in *Reid v. Georgia, supra*, defendant in this case arrived from a city known to be a source of drugs at an unusual hour, had no luggage, and separated from his companions. He appeared nervous and looked over his shoulder often. On very similar facts, the Supreme Court in *Reid* concluded that a seizure of the suspect was unjustified, noting that otherwise "a very large category of presumably innocent travelers" would "be subject to virtually random seizures." 448 U.S. at 441, 100 S.Ct. at 2754. The fact that this defendant's companion was heard to discuss "money" on the telephone does little to raise Agent West's hunch to the level of a reasonable suspicion. Innocent travelers, pursuing lawful activities, have been known to discuss "money" on the telephone as well. As in *Reid*, no reasonable and articulable suspicion existed as a matter of law, and the drugs seized from the defendant must therefore be excluded from evidence.

Even if the Court were to conclude that a reasonable and articulable suspicion did exist, an identical result would obtain due to the nature of the defendant's consent to the search of his bag. Agent West testified on the stand, and the government apparently concedes, that he lacked probable cause to arrest the defendant at the time he asked permission to search defendant's bag. The validity of the search therefore depends on the defendant's consent. As the Supreme Court has recently observed, "where the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority." *Florida v. Royer,* — U.S. ——, ——, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (plurality opinion).

■ The government has not met this burden here. Accepting the truth of all of Agent West's testimony, one could not characterize the defendant's consent as freely and voluntarily given. No officer told the defendant that he could refuse permission to search the bag if he so desired. Defendant was in the presence of four armed officers at the time Agent West asked to see his bag. Defendant testified that he handed the bag to the agent partly out of fear that it would be grabbed from his injured arm if he did not comply with the request. Under all of the circumstances, the consent alleged here was not voluntary, and the results of the search made in reliance upon it must therefore be excluded.

■ Finally, it is necessary to decide whether the illegal detention and search that occurred here taint the subsequent arrest and thereby require exclusion of the allegedly incriminating statements made by the defendant immediately following his arrest. *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). While the Supreme Court has never directly addressed the question of when to exclude incriminating statements that follow an illegal search, W. LaFave, 3 *Search & Seizure* § 11.4(c) (1978 & 1983 Supp.), its decision in *Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980), implies that the test announced in *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), would apply. In *Brown,* the Court rejected the argument that the giving of the *Miranda* warnings following an illegal arrest automatically removed the taint of illegality from any incriminating statements that followed. Instead, the Court held that trial courts must look at a variety of factors to decide whether a confession is a product of free will or of exploitation of the illegality of the arrest. Among the factors to be weighed in deciding whether to exclude statements are the temporal proximity of the arrest and the confession, the presence of intervening circumstances, the purpose and flagrancy of the official misconduct, and whether the *Miranda* warnings were given. 422 U.S. at 603–604, 95 S.Ct. at 2261–2262.

■ Applying this standard, it is clear that the statements of the defendant must be excluded from evidence. Even assuming that the statements were voluntary, they were elicited from the defendant within moments of when the illegal search took place and they were phrased in terms of explanations for the items discovered in that search. Other than the reading of the *Miranda* warnings, there was no intervening period or event during which the defendant could have formed a "free will" to confess or incriminate himself. Since the defendant's statements were made contemporaneously with an illegal search to explain items found during that search, they must be excluded.

An accompanying Order grants defendant's motions.