UNITED STATES of America

v.

**Karen D. BROWN.**

**Crim. No. 88–0161.**

United States District Court, District of Columbia.

June 27, 1988.

Thimi Mina, Asst. U.S. Atty., Washington, D.C., for U.S.

Stephen Scavuzzo, Washington, D.C., for Karen D. Brown.

### MEMORANDUM

JOHN GARRETT PENN, District Judge.

The defendant is charged in an indictment filed on May 5, 1988, with unlawful possession with intent to distribute five

grams or more of cocaine base. Her case is scheduled for a jury trial on June 28, 1988. The case is now before the Court on the defendant's motion to suppress evidence. The Court held a hearing on the motion on June 20, 1988, during which one witness, Detective Edward Curley, testified. The Court then took the motion under advisement.

After giving careful consideration to the motion, the opposition thereto, the arguments of counsel and the record in this case, the Court concludes that the motion should be denied.

## I

The facts are as follows: On April 7, 1988, Detective Curley was one of two or more officers of the Metropolitan Police Department who were located at Union Station in the District of Columbia for the purpose of intercepting the illicit transportation of illegal drugs into the District of Columbia area. At approximately 2:45 p.m. he was standing near Gate K so that he could observe persons entering the station from a train that had just arrived at the station. The train had either originated or had stopped in New York City.[1]

Curley testified that his attention was called to the defendant because she walked from the train and through the station at a fast pace, although he conceded that some of the other passengers were walking at the same pace. He had never seen or had any connection with the defendant, and he had no information that the defendant, or for that matter, anyone exiting the train in District of Columbia would be transporting illegal drugs. Nor was there anything unusual about the defendant's dress, her looks, or her actions.

The officer was dressed in casual clothes, as was another officer who served as his backup. The two officers kept apart from one another and, although both were armed, their weapons were hidden from view. In short, the officers appeared to be regular patrons of the station.

Curley followed the defendant through the station proper to a walkway leading to Massachusetts Avenue which is located in front of the original station.[2] He approached the defendant and asked whether he could speak with her. She consented and he asked whether she would mind showing him her train ticket.[3] When he saw that her ticket was from New York City to the District of Columbia, he continued to ask her questions. He asked her how long she expected to be in the District, where she was staying and why she was visiting the city. She responded that she expected to be in the area for approximately one week, that she would be staying with an uncle, although she did not have his address, and that she came to the District of Columbia to have her hair done at Iverson Mall.[4] He also asked for identification and she produced, among other identification, a "street corner identification."[5]

---

1. The record is not clear whether the train originated in New York City or in Boston, Massachusetts, or some point in between, but it is clear that the defendant boarded the train in New York City.

2. The original Union Station is undergoing renovation and is not used by the public. Another station has been constructed behind the original station and has been in use for a number of years. Passengers seeking to enter the present station may enter from an entrance located at the METRO (subway) station or from the METRO station, while passengers who wish to leave or enter from Massachusetts Avenue must walk along a covered walkway that runs, in part, along the side of the original station. Defendant was stopped while on the latter walkway.

3. Curley testified that if her ticket had been from any place other than New York City he probably would have broken off the conversation, since it is New York City that is one of the sources of drugs transported into this area.

4. Apparently it did not strike her as unusual that any one would travel from New York City to the District of Columbia, to go to a beauty parlor.

5. Curley testified that a "street corner identification" is one that anyone can purchase at a store. He noted that persons purchasing them were not required to give identification to demonstrate who they are. He also stated that such identifications could be purchased from legitimate stores or businesses and that there was nothing illegal about obtaining and possessing such identifications.

At this point in time, Curley advised her that he was part of a narcotics interdiction team and asked whether he could look into her bag.[6] The officer testified that, without hesitation, she responded that he could search the bag. She reached inside the bag to open it and the officer noticed that she seem to be moving a paper bag located in the travel bag from view. He asked her what was in the paper bag and she replied that it contained coffee. It was about this time that she attempted to close her bag with his hand inside. He stated that he asked her whether he could look in the brown bag and she again consented and opened the bag. Upon searching the paper bag, the officer saw another bag which appeared to contain a plastic bag or bags. He also noted that the substance inside did not appear to be coffee because it was not dark in color. Further search revealed that the substance was cocaine base.[7] In all, the officer found 133 small plastic bags of cocaine base. At this point, the defendant was placed under arrest.

## II

Under questioning by the Court, Curley testified that he was attracted to the defendant because she was walking briskly, she was carrying a small bag and she had a ticket reflecting that she boarded the train in New York City. As to these three observations, the Court finds that, although she was walking at a brisk pace, she was not out in front of the other passengers from the train and that she was one of perhaps the first ten people from the train to enter the station. Further, the Court finds that the officer does not know whether other passengers were carrying similar bags and single bags. Finally, the officer did not know, prior to asking her questions, whether she boarded the train in New York City, or Philadelphia, or Baltimore, or at

6. The officer described her bag as small, approximately 12 to 16 inches high and about eight inches at the bottom.

7. Apparently there is not dispute that the substance found inside the bag was cocaine base or "crack."

any of the other stops between Washington and New York.

The officer also advised the Court in response to its questions that the defendant did not fit any profile.[8] The officer readily concedes that he did not have a reasonable suspicion that the defendant was carrying drugs, or that she was committing a crime or about to commit a crime, and that he merely stopped her on a hunch. He stated that, as a part of the drug interdiction program, he stops citizens to ask them questions. He stated, however, that as in the case of the present stop, he speaks quietly and pleasantly, is not overbearing, does not act forcefully and always seeks the consent of the person stopped. He noted that if they do not desire to talk with him, they are free to walk away, since he has no grounds to stop them or to seize them. He does not select the persons he approaches based on their age, race or sex.

## III

The defendant contends that she was the victim of an illegal search and seizure by Detective Curley and that, accordingly, the evidence obtained as the result of the search should be suppressed. She argues that the detective violated her Fourth Amendment rights when he seized her without articulable suspicion or probable cause and she alleges that she never voluntarily consented to the search of her bag.

The facts in this case are undisputed.[9] Under those facts, three questions are raised. First, whether Detective Curley "seized" her when he asked to speak with her. Second, whether she voluntarily consented to the search of her bag. Third, whether, based upon her answers to the detective's questions, he had probable cause to search her bag.

A leading case on the issue of "contacts" by police officers with citizens is *United*

8. Often, persons who are intercepted at Union Station are stopped because they fall within a certain profile; for example, they are traveling from Florida to Washington after having been in Florida overnight only.

9. Detective Curley was the only witness and his testimony was not rebutted.

*States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). In that case, the Supreme Court explained that:

> The Fourth Amendment's requirement that searches and seizures be founded upon objective justification, governs all seizures of the person, "including seizures that involve only a brief detention short of traditional arrest ..." Accordingly, if the respondent was "seized" when the DEA agents approached her on the concourse and asked questions of her, the agents' conduct in doing so was constitutional only if they reasonably suspected the respondent of wrongdoing. But "[o]bviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."

446 U.S. at 551–52, 100 S.Ct. at 1875–76 (citations and footnote omitted). The Supreme Court went on to elaborate:

> We adhere to the view that a person is "seized" only when, by means of physical force or a show of authority, his freedom of movement is restrained. Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards. The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but "to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals ..." As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.

446 U.S. at 553–54, 100 S.Ct. at 1877 (citation omitted).

The Court must determine then, whether under the facts of this case, "a reasonable person would have believed that [she] was not free to leave." 446 U.S. at 554, 100 S.Ct. at 1877 (footnote omitted). And, as the Supreme Court observed, "the subjective intention of the [detective] in this case to detain the [defendant], had she attempted to leave, is irrelevant except insofar as that may have been conveyed to the [defendant]." 446 U.S. at 554, n. 6, 100 S.Ct. at 1877, n. 6. *See also, Gomez v. Turner,* 672 F.2d 134 (D.C.Cir.1982), *United States v. Wylie,* 569 F.2d 62 (D.C.Cir.1977).

While the Court concludes that the result one must reach in this case after applying the applicable case law is clear, it is somewhat troubling. The reason is, that in this case, there was absolutely nothing to put the officer on notice that the defendant was carrying drugs. He did not say that she acted nervous, or that she appeared to be with someone else, or that there was anything unusual about the bag she was carrying. Surely, the fact that the bag was small, or appeared to be almost empty suggests nothing since, for all the officer knew, she could have boarded the train in Baltimore and perhaps had no plans to remain over night. The fact that she walked at a fast pace proves nothing because it seems likely that there are many reasons why she would hurry to be on her way, including securing a taxicab or meeting someone or making an appointment. Simply stated, there was nothing to draw the officer's attention to the defendant.

While counsel referred to this as a *Mendenhall* case, the facts in *Mendenhall* are distinguishable. In *Mendenhall,* the DEA agent had a reason for stopping Mendenhall. In that case, the Supreme Court observed that the agents approached her "[a]fter observing [her] conduct which appeared to the agents to be characteristic of persons unlawfully carrying narcotics." 446 U.S. at 548, 100 S.Ct. at 1873. They noted that she fit a "drug courier profile", that she was on a flight from Los Angeles, a source city for heroin brought to Detroit, that she was the last person to leave the plane and appeared to be nervous, that she walked pass the baggage area without claiming any luggage and that she changed airlines for her flight out of Detroit.

In *Wylie, supra,* as in *Mendenhall,* the behavior of Wylie led the officer to observe him carefully and based on those observations, the officer finally approached Wylie and asked him questions relating to the attempted bank transaction the officer had observed. The officer was in the bank and observed Wylie standing at the teller's window with a blue piece of paper in his hand which the officer assumed was a check. There was a conversation between Wylie and the teller and then the officer heard the words "bank official" and observed Wylie walk over to a bank official, place the blue piece of paper in Wylie's pocket, speak to the officer for a moment and then walk at a brisk pace out of the bank. The officer had also noted that Wylie appeared to be looking over at him. When Wylie walked out of the bank, the officer followed and asked whether he could speak with him. Wylie agreed and the officer requested identification. Wylie claimed that he did not have identification, which struck the officer as being odd because Wylie had just gone to the bank, apparently to cash a check. Following several other questions, the officer and Wylie returned to the bank and the officer soon learned that Wylie had attempted to withdraw funds from a bank account which belonged to another person. In *Wylie* as in *Mendenhall,* the officer made the initial contact because of suspicious behavior of the defendant.

Finally, in *Gomez,* the plaintiffs filed a class action charging that the police were routinely engaging in unlawful and unconstitutional behavior during police-initiated encounters with pedestrians. The plaintiffs alleged that officers, lacking any articulable basis for believing that a crime had been or was about to be committed, would stop members of the class. The Court of Appeals stated that "[w]e reaffirm today that in this circuit the test is whether a reasonable person, innocent of any crime, would have felt free to walk away under the circumstances." *Gomez,* 672 F.2d at 141. The Court of Appeals considered whether a police request for identification was a show of authority that restrains a pedestrian. The court concluded that the nature of the question alone "without reference to the demeanor of the officer, the tone of the voice used, or any other circumstance, cannot convert an otherwise inoffensive encounter into a seizure." 672 F.2d at 142.

■ Turning to the facts in the instant case, the Court concludes that the defendant was not "seized" when Detective Curley asked to speak with her. There was no show of force, he spoke in a regular voice, he appeared to be alone, and his gun was hidden from view. Under these circumstances, there was no seizure—there was only contact between the defendant and Curley. The defendant did not offer any evidence to contradict the testimony of Curley and she did not testify, for example, that she felt she was being restrained or that she was not free to walk away. This being the case, the Fourth Amendment was not implicated and so much of the motion to suppress that is based on the "contacts" must be denied.

IV

■ The second question raised is whether the defendant voluntarily consented to the search of her bag. For the reasons set forth in Part, III, *supra,* the Court concludes that she voluntarily consent to the search of her bag. Each time Detective Curley asked her whether he could ask her questions or search her bag, she answered in the affirmative. For this reason, the Court concludes that so much of the motion as is based on the contention that there was an illegal search and seizure must be denied.

As to the issue of probable cause, the Court need not address the issue since Ms. Brown consented to the search.

In view of the above, the defendant's motion to suppress must be denied.

An appropriate order has been entered.