Opinion for the Court filed PER CURIAM.
Dissenting opinion filed by Circuit Judge BROWN.
Concurring opinion filed by Circuit Judge TATEL.
PER CURIAM:
Charged with unlawful possession of a firearm by a convicted felon, appellant moved to suppress the gun and his statement that he owned the gun, claiming that the arresting officers lacked reasonable suspicion to stop him. The district court denied his motion, ruling that the officers had reasonable suspicion at the time of the stop. We conclude that the stop happened later than the district court found, but because the record supports reasonable suspicion at that later point, we affirm.
I.
On the evening of March 30, 2004, four Metropolitan Police Department officers in an unmarked police car received a radio lookout about an attempted unauthorized use of a vehicle (UUV). The radioing officer had tried to stop the suspect’s car, but the suspect fled the scene. The lookout described the suspect as a black male, 5'8" in height, weighing 180 pounds, and dressed in a black coat and blue jeans.
Two blocks from the attempted UUV, at 7:25 p.m. — just minutes after the lookout— the four officers saw four black men talking to each other outside a gas station. Tr. of June 21, 2004 Hr’g at 16-17, 21. The district court found that all four men, one of whom was Appellant Melvin Goddard, were wearing black coats and blue jeans and that there was a substantial difference in their heights. United States v. Goddard, No. 04-214, slip op. at 2 (D.D.C. Dec. 18, 2006) (hereinafter “Supplemental Findings”); Tr. of June 21, 2004 *459 Hr’g at 83. Only two were close to 5'8" (one was 5'6" and the other between 5'6" and six feet), while Goddard and Vaughn Walker, a defense witness, were both over six feet tall. According to one of the officers, the four men “for the most part” matched the lookout “as far as the clothes thing, height and weight.” Tr. of June 21, 2004 Hr’g at 17. The same officer later clarified that despite his uncertainty about the consistency of the men’s heights with the lookout description, he decided to approach them based on “the clothes worn by the defendant and the other three gentlemen.” Id. at 21-22.
The officers pulled into the gas station, fifteen to twenty feet away from the group of men. All four officers wore plain clothes, jackets with an MPD logo, and badges. Their guns and handcuffs were showing, but the guns were not drawn. Once the officers pulled into the gas station, Walker began moving away from the group. As the officers exited their car, Goddard “held the right side of his waistband, like he was holding ... a gun.” Id. at 8. Approaching the group of men, one of the officers overheard Goddard say he had a gun, whereupon the officer shouted “gun.” Although Walker’s testimony was less than clear as to the sequence of events, the district court, contrary to the dissent’s characterization, see Dissenting Op. at 466-67, found that Walker was still moving away from the group of men at the time the officer shouted “gun,” Tr. of June 21, 2004 Hr’g at 81, 84-85 (making this finding shortly after its announcement that “[t]he court will make the following findings of fact,” and not, as the dissent suggests, in a separate summary of Walker’s testimony, see Dissenting Op. at 466-67). Walker testified that the officers told him to return, at which point he “turned back around” and was pulled aside by one of the officers. Id. at 59-60. Two of the officers then handcuffed Goddard and conducted a pat-down, finding a gun in his waistband. At that point, the officers placed Goddard under arrest. After his arrest but before he received a Miranda warning, Goddard explained that he was carrying the gun because he had just gotten out of jail and had been shot recently.
A grand jury indicted Goddard for possession of a firearm by a convicted felon. 18 U.S.C. § 922(g)(1). Arguing that the officers lacked reasonable suspicion for the stop, Goddard moved to suppress the gun and his admission that he owned it. Although believing it “a close case as to whether these facts meet the Terry standard,” Tr. of June 21, 2004 Hr’g at 81, the district court nonetheless found that the officers had reasonable suspicion to stop Goddard. The court based its conclusion on two primary circumstances: that the stop occurred two blocks from and soon after the attempted UUV; and that the men loosely matched the suspect’s description, given that all four wore blue jeans and black coats and at least one was close to the suspect’s height.
After the court denied his motion to suppress, Goddard pleaded guilty, reserving the right to raise the suppression issue on appeal. Following oral argument, we remanded the record to the district court for supplemental findings as to “the sequence of events surrounding appellant’s stop and seizure, the factors establishing when the police contact became a stop, and the facts known to the police officers at those points.” United States v. Goddard, No. 05-3080 (D.C.Cir. Nov. 9, 2006). In its supplemental memorandum, the district court made the following finding: “In this case, the [officers’] ‘contact’ became a ‘stop’ as soon as the police officers drove up to the gas station ... to investigate whether the four African-American men they saw standing and talking included the *460 [attempted UUV suspect].” Supplemental Findings at 2.
II.
The Fourth Amendment provides that “[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause.” U.S. Const, amend. IV. As an exception to the Fourth Amendment’s warrant requirement, officers may conduct a brief investigative “Terry stop” so long as they have “reasonable, articula-ble suspicion” of criminal conduct. Illinois v. Wardlow, 528 U.S. 119, 123, 120 S.Ct. 678, 145 L.Ed.2d 570 (2000) (citing Terry v. Ohio, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Terry stops require only that officers have a “minimal level of objective justification,” INS v. Delgado, 466 U.S. 210, 217, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984)—a standard significantly lower than the probable cause required for a warrant.
In this case, we face two distinct issues: when the stop occurred and whether the officers had reasonable suspicion at that time. Both are questions of law that we consider de novo. United States v. Maragh, 894 F.2d 415, 417 (D.C.Cir.1990) (“[T]he [Supreme] Court has never deferred to the trier of fact regarding the question of seizure.”); United States v. Christian, 187 F.3d 663, 666 (D.C.Cir.1999) (applying de novo review to district court’s determination of reasonable suspicion).
As to the first issue, a stop takes place “[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen,” Terry, 392 U.S. at 19 n. 16, 88 S.Ct. 1868, or, put differently, “only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave,” California v. Hodari D., 499 U.S. 621, 627-28, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) (alteration in original) (quoting United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (plurality opinion)). “[T]he test must not be what the defendant himself ... thought, but what a reasonable man, innocent of any crime, would have thought had he been in the defendant’s shoes.” Gomez v. Turner, 672 F.2d 134, 140 (D.C.Cir.1982) (quoting Coates v. United States, 413 F.2d 371, 373 (D.C.Cir.1969)). Under this test, neither the subjective impressions of the defendant nor the subjective intentions of the officer determine whether a seizure has occurred. See id. at 143 (“[T]he intent of the officer or the reason behind his decision to approach a pedestrian cannot be the basis upon which we determine whether a seizure has occurred.”). In deciding whether a stop has occurred, this circuit has cited the factors listed by Justice Stewart in United States v. Mendenhall: “the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer’s request might be compelled.” 446 U.S. at 554, 100 S.Ct. 1870; Gomez, 672 F.2d at 144. In addition, we consider “the demeanor of the approaching officer,” Gomez, 672 F.2d at 144, “whether the officer ... wore a uniform,” and “the time and place of the encounter,” United States v. Wood, 981 F.2d 536, 539 (D.C.Cir.1992). Of course, not all interactions between police and citizens are stops, as “law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place.” Florida v. Royer, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); see also United States v. Nurse, 916 F.2d 20, 23 (D.C.Cir.1990).
*461 We disagree with the district court that the stop happened “as soon as the police officers drove up to the gas station.” Supplemental Findings at 2. By itself, the presence of a police car is an insufficient show of authority to make a reasonable, innocent person feel unfree to leave. For example, in Michigan v. Chesternut, 486 U.S. 567, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988), where four officers in a police cruiser accelerated to catch up with a running pedestrian and drove parallel to him for a short while, the Supreme Court explained that although the presence of a police car might be “somewhat intimidating,” such police presence does not constitute a seizure where the officers did not use their siren or flashers, did not command the defendant to stop, did not display then-weapons, and did not drive aggressively to block or control the defendant’s movement. Id. at 569, 575, 108 S.Ct. 1975. Similarly, in United States v. Johnson, 212 F.3d 1313 (D.C.Cir.2000), we found that no seizure had occurred where police officers drove their unmarked car into a parking lot twenty-five feet away from the defendant’s car. Id. at 1317. Here, when the. officers drove their unmarked police car into the gas station, the car was fifteen to twenty feet away from the group of men, and nothing in the record indicates that the officers drove aggressively or impeded Goddard’s movement. Moreover, the fact that the car halted in the gas station’s entrance way does not suggest that a reasonable, innocent pedestrian would have felt unfree to leave.
Nor did the stop occur when the police exited their car and began to approach Goddard and the other three men. Admittedly, some of the circumstances are suggestive of a stop, including that four officers were present — all with guns and handcuffs showing and wearing identifiable MPD jackets and badges — and that the officers “jumped out” of the car. Tr. of June 21, 2004 Hr’g at 58. But the presence of multiple officers does not automatically mean that a stop has occurred. See Chesternut, 486 U.S. at 575, 108 S.Ct. 1975 (finding no seizure where police car with four officers followed defendant); see also United States v. Tavolacci, 895 F.2d 1423, 1424-25 (D.C.Cir.1990) (finding no seizure where at most two officers were in defendant’s view). Our cases, moreover, allow police officers to make a contact — to approach individuals and interact with them — without reasonable suspicion. See, e.g., Nurse, 916 F.2d at 23 (finding no stop where officer who identified himself as a police officer approached and questioned defendant at a taxi stand); United States v. Winston, 892 F.2d 112, 114, 117 (D.C.Cir.1989) (finding no seizure where officer who identified himself as a police officer approached and asked to speak with defendant outside of bus station). As we have explained:
[T]he presence of the officer as a figure of governmental authority does not, by itself, constitute the “show of authority” necessary to make a reasonable person feel unfree to leave. There must be some additional conduct by the officer to overcome the presumption that a reasonable person is willing to cooperate with a law enforcement officer. The approach and direction of a question by a police officer cannot be, as a matter of fact or of law, a seizure of the person so approached.
Gomez, 672 F.2d at 142 (footnote omitted). Thus, the fact that the officers wore MPD gear, including guns and handcuffs, does not mean that a stop occurred. See United States v. Samuels, 938 F.2d 210, 213-14 (D.C.Cir.1991) (“Although the visibility of handcuffs, like the display of a uniform, a badge, or a gun, is relevant to whether an encounter with police constitutes a seizure, the passive display of handcuffs, by itself, *462 is not a sufficient show of authority to cause a reasonable, law-abiding person to believe his liberty is being restrained.” (citations omitted)). Contrary to the dissent’s suggestion, we think Walker’s characterization of the officers as “jumping] out” of the car, even coupled with the car’s presence in the entrance way, an insufficient show of authority to constitute a stop. See Dissenting Op. at 465-66, 468-69.
Of course, we can imagine additional circumstances that might have made a reasonable person in Goddard’s position feel unfree to leave, such as if the police had run aggressively towards him. See Gomez, 672 F.2d at 144 (listing officer’s demeanor as a factor in determining whether a stop had occurred). But because Goddard made no such showing, we need not decide whether such circumstances would produce a different result. See, e.g., Winston, 892 F.2d at 117 (holding that where “no ... showing was made” that officer’s action would make “reasonable, law-abiding person in [defendant’s] position” feel unfree to walk away, district court erred in finding Fourth Amendment violation); Shell v. United States, 448 F.3d 951, 955 (7th Cir.2006) (finding no seizure where defendant failed to show that officers restrained his liberty).
Based on the record before us, the stop occurred when one of the officers yelled “gun” and told Walker to return to the group. We have no doubt that a reasonable person would feel unfree to leave upon hearing officers seven or eight feet away yell “gun” — a statement sure to arouse the concern of all officers and civilians in the immediate area — and order one of his companions to return. See Wood, 981 F.2d at 540 (finding stop where officer ordered defendant to stop); United States v. Alarcon-Gonzalez, 73 F.3d 289, 292 (10th Cir.1996) (finding seizure where officer ordered defendant’s coworker to “freeze” when individuals “were only five feet apart and ... obviously working together”).
 Nor do we have any doubt that by this point — and this is the second issue we must address — the officers had reasonable suspicion to stop Goddard. Reasonable suspicion requires that, based on the totality of the circumstances, an officer have “a particularized and objective basis for suspecting the particular person stopped of criminal activity.” United States v. Cortez, 449 U.S. 411, 417-18, 101 S.Ct. 690, 66 L.Ed,2d 621 (1981). Here, the officers had plenty of reason to suspect Goddard had a weapon, which Goddard himself concedes would justify a stop. Oral Arg. at 7:58; see D.C. Code § 22-4504 (2001) (prohibiting carrying weapons in D.C. without a license). After “[holding] the right side of his waistband, like he was holding ... a gun,” Tr. of June 21, 2004 Hr’g at 8; see United States v. Brown, 334 F.3d 1161, 1167 (D.C.Cir.2003) (holding that furtive movements in response to police presence may create reasonable suspicion), Goddard declared he had a gun, giving the officers ample grounds for the Terry stop.
Thus, because the officers had reasonable suspicion at the time of the stop, we affirm Goddard’s conviction.

So ordered.