# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued December 4, 2014          Decided April 21, 2015

No. 13-3102

UNITED STATES OF AMERICA,
APPELLEE

v.

WILL GROSS,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:13-cr-00068-1)

*Sandra G. Roland*, Assistant Federal Public Defender, argued the cause for appellant. With her on the briefs was *A.J. Kramer*, Federal Public Defender.

*Nicholas P. Coleman*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Ronald C. Machen Jr.*, U.S. Attorney, and *Elizabeth Trosman* and *Stephen J. Gripkey*, Assistant U.S. Attorneys.

Before: BROWN and SRINIVASAN, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* SRINIVASAN.

Concurring opinion filed by *Circuit Judge* BROWN.

SRINIVASAN, *Circuit Judge*:  Appellant Will Gross was indicted on one count of unlawful possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).  Gross filed a motion to suppress the firearm, arguing that its discovery on his person was the fruit of an unlawful seizure.  The district court denied the motion, reasoning that Gross had not been seized when officers approached him and asked if he was carrying a gun.  The case then proceeded to trial, culminating in Gross's conviction.  Gross now appeals the denial of his motion to suppress, arguing that officers subjected him to an unlawful seizure before finding the gun.  We conclude that no unlawful seizure occurred, and we therefore affirm.

I.

On the evening of February 4, 2013, four officers of the Washington, D.C. Metropolitan Police Department's Gun Recovery Unit drove along the 4000 block of 9th Street, S.E. The officers were working on "gun patrol," which involved "[r]iding through the area looking to see if [they] could recover any guns."  Mot. Hr'g Tr. 40 (June 17, 2013).  The officers' car was unmarked, but each officer wore a tactical vest that said "police" in large letters on the front and back.  Officer Jason Bagshaw drove the vehicle and Officer Jordan Katz rode in the rear driver-side seat.  Two other officers—whose conduct is not at issue—sat in the passenger-side seats.

Around 7 p.m., the officers came across appellant Gross on 9th Street as he walked along the sidewalk to the left of the car.  When the officers reached the corner of 9th and Bellevue Street, they turned left onto Bellevue.  Gross also turned onto Bellevue and continued to travel in the same direction as the

officers. Officer Bagshaw slowed the car as it moved next to Gross and shined a flashlight on Gross to get his attention. Officer Bagshaw then called out to Gross from the car, "[H]ey, it is the police, how are you doing? Do you have a gun?" *Id*. at 10. Gross stopped, but did not answer, and Officer Bagshaw stopped the car to remain parallel with Gross. Bagshaw then asked Gross, "Can I see your waistband?" *Id*. at 12. Still not speaking, Gross responded by lifting his jacket slightly to show his left side, looking back over his shoulder in the process. Officer Bagshaw, apparently satisfied with the interaction, began to roll the car forward.

Officer Katz, however, asked Officer Bagshaw to stop the car. Suspicious of Gross, Officer Katz opened the driver-side rear door and asked, while stepping out of the vehicle, "[H]ey man, can I check you out for a gun?" *Id*. at 15. As soon as Officer Katz began to exit the car, Gross turned and ran back towards 9th Street. Officer Katz gave chase. He observed Gross patting his right side with his hand as he ran, behavior that Officer Katz later testified "can mean someone is trying to hold a gun in their waistband." *Id*. at 15-16. Officer Katz also smelled PCP while pursuing Gross. After a short chase, Officer Katz apprehended Gross. With Gross in handcuffs, Officer Katz performed a frisk and recovered a .40-caliber semiautomatic handgun from underneath Gross's waistband.

After his indictment, Gross filed a motion to suppress the handgun on the ground that its recovery derived from an unlawful seizure. At the motion hearing, Officer Katz testified about his recollections of the encounter with Gross, describing both his actions and those of Officer Bagshaw. After hearing Officer Katz's testimony and arguments from both sides, the district court denied Gross's motion. The court reasoned that no Fourth Amendment seizure occurred until after Gross fled because nothing to that point would have

indicated to a reasonable person that he lacked freedom to disregard the officers' questions and walk away. The court concluded that Gross's flight, when considered in conjunction with his other behavior, provided the officers with reasonable grounds to detain him and conduct a pat-down frisk for weapons.

After the district court denied his motion to suppress, Gross waived his right to a jury trial and proceeded to a bench trial. The district court found Gross guilty and sentenced him to twenty-one months of imprisonment followed by three years of supervised release. Gross now appeals the district court's denial of his suppression motion.

II.

Gross argues that the district court erred in denying his motion to suppress the handgun found on his person. According to Gross, he was subjected to an unlawful seizure when Officer Bagshaw asked if he was carrying a gun and would reveal his waistband. The government argues that Gross is barred from raising that seizure argument on appeal because he failed to raise it with adequate specificity in the district court. We decline to resolve whether Gross forfeited his argument. We instead conclude that, even assuming Gross adequately preserved the argument he now presses, his unlawful-seizure argument fails on the merits.

The Fourth Amendment guarantees the "right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. The prohibition against unreasonable seizures requires that all seizures, even ones involving "only a brief detention short of traditional arrest," be founded upon reasonable, objective justification. *United States v. Brignoni-Ponce*, 422 U.S. 873,

878 (1975). But not all interactions between police officers and citizens amount to a "seizure" for Fourth Amendment purposes.

A Fourth Amendment seizure occurs only when an officer, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). Unless "a reasonable person would have believed that he was not free to leave," no seizure will have taken place. *United States v. Maragh*, 894 F.2d 415, 418 (D.C. Cir. 1990) (quoting *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988)). That "reasonable person" test asks, "not . . . what the defendant himself . . . thought, but what a reasonable man, innocent of any crime, would have thought had he been in the defendant's shoes." *United States v. Goddard*, 491 F.3d 457, 460 (D.C. Cir. 2007) (per curiam).

Gross argues that he was subjected to a Fourth Amendment seizure when Officer Bagshaw, speaking to him from the police car, asked if he was carrying a gun and would expose his waistband. Right out of the gate, Gross's argument runs into the settled principle that a "seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). Even when officers "have no basis for suspecting a particular individual, they may generally ask questions of that individual . . . as long as the police do not convey a message that compliance with their requests is required." *Id.* at 435. And "[w]hile most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response." *United States v. Drayton*, 536 U.S. 194, 205 (2002).

Gross contends that a reasonable, innocent person nonetheless would have considered his encounter with Officer Bagshaw to be nonconsensual in light of the particular circumstances. Gross emphasizes three factual considerations in support of his argument: (i) there were four officers in the car, each of whom wore a tactical vest; (ii) the officers followed Gross; and (iii) Officer Bagshaw's questions were accusatory, implying that Gross could not leave until he proved his innocence (i.e., that he did not possess a gun). Because we consider "the totality of the circumstances" in assessing whether there was a seizure, *see Samson v. California*, 547 U.S. 843, 848 (2006), we examine the particular factual considerations emphasized by Gross in the context of the overall effect of the encounter. We conclude that the circumstances are materially indistinguishable from those in cases in which our court, or the Supreme Court, has determined that no seizure took place. Those decisions compel the same outcome here.

Gross initially points to the fact that four officers were present in the car and that the officers wore tactical vests marked "police." We confronted comparable circumstances in *United States v. Goddard*, 491 F.3d 457. There, four officers exited their police car and approached the defendants while wearing badges and jackets marked with a police logo. *See id.* at 459. We concluded that those circumstances did not amount to a seizure. As we explained, "the presence of multiple officers" wearing "[police] gear, including guns and handcuffs," does not "automatically mean that a stop has occurred." *Id.* at 461. The circumstances of this case are, if anything, less suggestive of a seizure than those in *Goddard*. Here, all four officers remained in a car separated from Gross by one lane of traffic during Officer Bagshaw's questioning. And while the officers carried weapons, there is no indication that the weapons were visible to Gross from the sidewalk.

The officers' "following" of Gross likewise did not convert the encounter into a seizure. Testimony from the motion hearing showed that the officers merely turned in the same direction as Gross and then slowed their car for a few seconds as it passed next to him across one lane of traffic. In *Michigan v. Chesternut*, 486 U.S. 567, the Supreme Court concluded that no seizure had occurred when four officers in a police car "accelerated to catch up with a running pedestrian and drove parallel to him for a short while." *Goddard*, 491 F.3d at 461 (describing *Chesternut*). Although the "presence of a police car might be 'somewhat intimidating,'" *id.* at 461 (quoting *Chesternut*, 486 U.S. at 575), the act of approaching a person in a police car "does not constitute a seizure where the officers [do] not use their siren or flashers, [do] not command the [person] to stop, [do] not display their weapons, and [do] not drive aggressively to block or control the [person's] movement," *id.* Just as in *Chesternut* and *Goddard*, the officers did none of that in this case.

With regard to the questions posed by Officer Bagshaw, the "nature of a police officer's question[s]" can bear on whether a person has been seized. *Gomez v. Turner*, 672 F.2d 134, 146 (D.C. Cir. 1982). Questions alone, however, ordinarily do not amount to a "show of authority" sufficient to constitute a seizure. Gross points to cases in which direct *accusations* of criminal conduct by officers have weighed in favor of finding a seizure. *See, e.g.*, *United States v. Tyler*, 512 F.3d 405 (7th Cir. 2008). But Officer Bagshaw's questions ("Do you have a gun?", "Can I see your waistband?") did not accuse Gross of possessing a gun or committing a crime.

The Supreme Court's decision in *United States v. Drayton*, 536 U.S. 194, is instructive. The Court held that no seizure had taken place when multiple officers wearing visible

badges boarded a bus and asked passengers numerous questions. *Id.* at 198-99. Of particular salience, one officer asked if a passenger "had any weapons or drugs in his possession," and then asked, "Do you mind if I check your person?" *Id.* at 199. Officer Bagshaw posed highly similar questions to Gross. Indeed, whereas the officer in *Drayton* asked if he could perform a search of the passenger's person, here, Officer Bagshaw merely asked whether Gross himself would reveal his waistband. And while the passengers in *Drayton* were questioned while inside a bus with an officer positioned near the exit, *see id.* at 205, the street encounter in this case posed no physical impediment to Gross's freedom to walk away.

Reviewing the totality of the circumstances in this case in light of precedents involving comparable interactions, we conclude that Officer Bagshaw's questioning of Gross did not effect a seizure for purposes of the Fourth Amendment. Moreover, Gross raises no challenge to the district court's conclusion that the circumstances did not subsequently ripen into a seizure when Officer Katz exited the police car and asked if he could check Gross for a gun. Nor does Gross contest the district court's determination that, once he attempted to flee in response to that question, the officers had authority to stop him and conduct the frisk that uncovered the handgun on his person. Consequently, there is no ground for disallowing the introduction of the firearm into evidence.

\* \* \* \* \*

For the foregoing reasons, we affirm the district court's denial of Gross's motion to suppress.

*So ordered.*

BROWN, *Circuit Judge*, concurring:

In its efforts to ferret out illegal firearms the District has implemented a "rolling roadblock." Officers randomly trawl high crime neighborhoods asking occupants who fit a certain statistical profile—mostly males in their late teens to early forties—if they possess contraband. Despite lacking any semblance of particularized suspicion when the initial contact is made, the police subject these individuals to intrusive searches unless they can prove their innocence. Our case law considers such a policy consistent with the Fourth Amendment. *See, e.g.*, *United States v. Goddard*, 491 F.3d 457 (D.C. Cir. 2007). I continue to think this is error. Our jurisprudence perpetuates a fiction of voluntary consent where none exists and validates a policy that subverts the framework of *Terry v. Ohio*, 392 U.S. 1 (1968).

\* \* \*

"Nothing is more clear than that the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry." *Davis v. Mississippi*, 394 U.S. 721, 726 (1969). "*Terry* for the first time recognized an exception to the requirement that Fourth Amendment seizures of persons must be based on probable cause." *Dunaway v. New York*, 442 U.S. 200, 208–09 (1979). There, the Supreme Court wisely found that where police officers "ha[ve] reason to believe [they] [are] dealing with an armed and dangerous individual . . . the[y] [] need not be absolutely certain that the individual is armed," so long as there are particularized facts that could lead a "reasonably prudent person to believe their safety or that of others [is] in danger." *Terry*, 392 U.S. at 27.

There is a further exemption beyond the narrow *Terry* rule; voluntary consent to a search dispels any "inference of coercion." *United States v. Drayton*, 536 U.S. 194, 207 (2002). Because no Fourth Amendment interest is triggered a

search may proceed on the basis of individual consent, despite the absence of reasonable and particularized suspicion of misconduct. *See id.* at 201, 207–08; *Florida v. Rodriguez*, 469 U.S. 1, 5–6 (1984) ("[C]onsensual encounter[s] [] implicate[] no Fourth Amendment interest.").

The District's Gun Recovery Unit relies on the latitude afforded by voluntary consent to facilitate both suspicionless "consented" searches and *Terry* seizures premised on purportedly reasonable suspicions. But in the particulars of its application, the District's policy perverts the logic underlying *Terry*.

*Terry*'s premise is straightforward: "police officer[s] must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [] intrusion" into a citizen's autonomy. 392 U.S. at 21. But rather than rely upon particularized suspicions in the first instance, the District maximizes its odds of illegal firearm recovery by patrolling high crime neighborhoods "looking for guns," or more accurately, looking for people likely to have guns. Transcript of Motions Hearing at 40, United States v. Gross, No. CR13-068 (D.D.C. June 17, 2013). But playing the odds is not the same thing as reasonable suspicion. *See also United States v. Black*, 707 F.3d 531, 542 (4th Cir. 2013) (mere presence in a high crime area at night does not support involuntary detention by police).

In the absence of any particularized reports, evidence, or suspicions, patrolling officers simply question every likely person they encounter. They "employ[] a simple technique: they ask[] any individual they encounter[] if he or she ha[s] a gun and then watch[] to see if that individual engage[s] in what the officers perceive[] to be suspicious behavior."

*Robinson v. United States*, 76 A.3d 329, 331 (D.C. 2013). If consent to question or search is refused, officers frequently construe citizens' varied reactions to their probes as rationalizing a *Terry* stop.[1]

The Gun Recovery Unit's officers have all but candidly recognized that their policy amounts to statistical gamesmanship. In a prior case involving the same policy, Officer Katz, for example, noted that the unit's officers targeted a particular "high crime" area for patrols because it "was one of [the officer's] top-yielding gun areas as far as recovering firearms off of people" and stopped an individual for questioning without "any discussion among" the officers about the rationale for the stop, where neither Officer Katz nor the other officers "[saw] anything, initially, about him" to suggest he had a gun. Transcript of Motions Hearing at 8, 24, United States v. Robinson, No. 2011-CF2-023024 (D.C. Super. Ct. May 10, 2012). *See also id.* at 29 (Officer Katz stating, "I didn't see anything that would make me think that [the defendant] had a gun," prior to questioning him about firearm possession). As the D.C. Superior Court noted, like all officers in the District's Gun Recovery Unit, "[Officer Katz] asked [the individual] whether he had a weapon, not because he had any suspicion that he did, but because that's his job. He's a gun recover[er]—and he asks *everyone*. Apparently, he goes down the street asking everyone, do you have a gun." *Id.* at 120 (emphasis added).

As a thought experiment, try to imagine this scene in Georgetown. Would residents of that neighborhood maintain

---

[1] The act of refusal itself does not, however, form the basis of the justification. *See Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) ("[R]efusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a . . . seizure.").

there was no pressure to comply, if the District's police officers patrolled Prospect Street in tactical gear, questioning each person they encountered about whether they were carrying an illegal firearm? Nothing about the Gun Recovery Unit's modus operandi is designed to convey a message that compliance is *not* required. While viewing such an encounter as consensual is roughly equivalent to finding the latest Sasquatch sighting credible, I submit to the prevailing orthodoxy, but I continue to reject its counterintuitive premise.

Under our Circuit precedents there is little question we must treat consent to such questioning as voluntary, even when—as here—multiple officers in tactical gear engage an individual, repeatedly question him about his possession of illegal firearms, and ask that he consent to a search. Brief of Appellant at 4–6, United States v. Gross, No. 13-3102 (D.C. Cir. June 12, 2014). Our decision in *Goddard*, for example, involved facts more extreme than the present. This Court nonetheless found no *Terry* stop where four officers dressed in police gear used their patrol car to block the entrance of a gas station—where the defendant stood with a group of other young men—and then "jumped out" of their vehicle to confront them. 491 F.3d at 461–62.

Yet our case law's stubborn mythology that consent is truly voluntary belies the all but foreordained nature of the resulting search. Individuals approached by the District's Gun Recovery Unit officers know they possess little more freedom than to elect the manner in which to be skewered upon Morton's Fork.[2] The outcome is effectively

---

[2] Morton's Fork derives from "Archbishop of Canterbury, Cardinal, and Minister of Henry VII John Morton's (supposed) method of levying forced loans by arguing that those who were obviously rich

predetermined. They will be searched. The choice they face is to "voluntarily" acquiesce to the officers' request or to have any reaction to the officers' inquiries—regardless of how objectively benign—serve as the factual predicate justifying a *Terry* search. *See, e.g.*, Transcript of Motions Hearing at 80, United States v. Gross (finding articulable facts warranting Officer Katz's search of Gross, who looked to the rear after noticing the officers and failed to completely comply with a request that he voluntarily show his waistband, lifting only part of his shirt).

With the guise of voluntary consent stripped away, the reality of the District's regime is revealed. It is a rolling roadblock that sweeps citizens up at random and subjects them to undesired police interactions culminating in a search of their persons and effects. If the Fourth Amendment is intended to offer meaningful protection in the context of *Terry* stops, the voluntary consent exemption cannot be used to engage with members of the public *en masse* and at random to fabricate articulable suspicions for virtually every citizen officers encounter on patrol.

"No right is held more sacred, or is more carefully guarded . . . than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Terry*, 392 U.S. at 9. Our

---

could afford to pay, and those who lived frugally must have amassed savings. Hence in extended and allusive use it is: a practical dilemma, especially one in which both of the choices . . . available disadvantage or discredit the chooser." *United States v. Johnson*, 482 F. App'x 137, 145 n.14 (6th Cir. 2012) (internal punctuation marks and citations omitted).

precedents, however, fail to safeguard this fundamental right, and instead permits encounters intended to coerce "consented" searches and justify *Terry* stops through purposive interpretation of citizens' reactions to "voluntary" questioning.

Persons questioned by the District's Gun Recovery Unit patrols may reasonably be at a loss as to how to react to these contacts. Is there a means to react to such nominally voluntary encounters that might preserve their constitutional prerogatives? I offer this advice: speak to officers firmly, politely, respectfully. Tell them, "I do not wish to have an encounter with the police right now. Am I free to leave?" If the answer is "no," then coercion will cease to masquerade as consent. Our courts will be forced, at last, to directly grapple with the reality of the District's policy of routinized and involuntary seizures.