*789 BROWN, Circuit Judge,
concurring:
In its efforts to ferret out illegal firearms the District has implemented a “rolling roadblock.” Officers randomly trawl high crime neighborhoods asking occupants who fit a certain statistical profile— mostly males in their late teens to early forties — if they possess contraband. Despite lacking any semblance of particularized suspicion when the initial contact is made, the police subject these individuals to intrusive searches unless they can prove their innocence. Our case law considers such a policy consistent with the Fourth Amendment. See, e.g., United States v. Goddard, 491 F.3d 457 (D.C.Cir.2007). I continue to think this is error. Our jurisprudence perpetuates a fiction of voluntary consent where none exists and validates a policy that subverts the framework of Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
* * *
“Nothing is more clear than that the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry.” Davis v. Mississippi, 394 U.S. 721, 726, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969). “Terry for the first time recognized an exception to the requirement that Fourth Amendment seizures of persons must be based on probable cause.” Dunaway v. New York, 442 U.S. 200, 208-09, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). There, the Supreme Court wisely found that where police officers “ha[ve] reason to believe [they] [are] dealing with an armed and dangerous individual ... the[y] [ ] need not be absolutely certain that the individual is armed,'” so long as there are particularized facts that could lead a “reasonably prudent person to believe their safety or that of others [is] in danger.” Terry, 392 U.S. at 27, 88 S.Ct. 1868.
There is a further exemption beyond the narrow Terry rule; voluntary consent to a search dispels any “inference of coercion.” United States v. Drayton, 536 U.S. 194, 207, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002). Because no Fourth Amendment interest is triggered a search may proceed on the basis of individual consent, despite the absence of reasonable and particularized suspicion of misconduct. See id. at 201, 207-08, 122 S.Ct. 2105; Florida v. Rodriguez, 469 U.S. 1, 5-6, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984) (“[Consensual encounter[s] [ ] implicate[ ] no Fourth Amendment interest.”).
The District’s Gun Recovery Unit relies on the latitude afforded by voluntary consent to facilitate both suspicionless “consented” searches and Terry seizures premised on purportedly reasonable suspicions. But in the particulars of its application, the District’s policy perverts the logic underlying Terry.
Terry’s premise is straightforward: “police officer[s] must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [] intrusion” into a citizen’s autonomy. 392 U.S. at 21, 88 S.Ct. 1868. But rather than rely upon particularized suspicions in the first instance, the District maximizes its odds of illegal firearm recovery by patrolling high crime neighborhoods “looking for guns,” or more accurately, looking for people likely to have guns. Transcript of Motions. Hearing at 40, United States v. Gross, No. CR13-068 (D.D.C. June 17, 2013). But playing the odds is not the same thing as reasonable suspicion. See also United States v. Black, 707 F.3d 531, 542 (4th Cir.2013) (mere presence in a high crime area at night does not support involuntary detention by police).
In the absence of any particularized reports, evidence, or suspicions, patrolling *790 officers simply question every likely person they encounter. They “employ[] a simple technique: they ask[ ] any individual they encounter[ ] if he or she ha[s] a gun and then watch[ ] to see if that individual engage[s] in what the officers pereeive[ ] to be suspicious behavior.” Robinson v. United States, 76 A.3d 329, 331 (D.C.2013). If consent to question or search is refused, officers frequently construe citizens’ varied reactions to their probes as rationalizing a Terry stop.[1]
The Gun Recovery Unit’s officers have all but candidly recognized that their policy amounts to statistical gamesmanship. In a prior case involving the same policy, Officer Katz, for example, noted that the unit’s officers targeted a particular “high crime” area for patrols because it “was one of [the officer’s] top-yielding gun areas as far as recovering firearms off of people” and stopped an individual for questioning without “any discussion among” the officers about the rationale for the stop, where neither Officer Katz nor the other officers “[saw] anything, initially, about him” to suggest he had a gun. Transcript of Motions Hearing at 8, 24, United States v. Robinson, No.2011-CF2-023024 (D.C.Super.Ct. May 10, 2012). See also id. at 29 (Officer Katz stating, “I didn’t see anything that would make me think that [the defendant] had a gun,” prior to questioning him about firearm possession). As the D.C. Superior Court noted, like all officers in the District’s Gun Recovery Unit, “[Officer Katz] asked [the individual] whether he had a weapon, not because he had any suspicion that he did, but because that’s his job. He’s a gun recoverfer]— and he asks everyone. Apparently, he goes down the street asking everyone, do you have a gun.” Id. at 120 (emphasis added).
As a thought experiment, try to imagine this scene in Georgetown. Would residents of that neighborhood maintain there was no pressure to comply, if the District’s police officers patrolled Prospect Street in tactical gear, questioning each person they encountered about whether they were carrying an illegal firearm? Nothing about the Gun Recovery Unit’s modus operandi is designed to convey a message that compliance is not required. While viewing such an encounter as consensual is roughly equivalent to finding the latest Sasquatch sighting credible, I submit to the prevailing orthodoxy, but I continue to reject its counterintuitive premise.
Under our Circuit precedents there is little question we must treat consent to such questioning as voluntary, even when — as here — multiple officers in tactical gear engage an individual, repeatedly question him about his possession of illegal firearms, and ' ask that he consent to a search. Brief of Appellant at 4-6, United States v. Gross, No. 13-3102, 2014 WL 2621723 (D.C.Cir. June 12, 2014). Our decision in Goddard, for example, involved facts more extreme than the present. This Court nonetheless found no Terry stop where four officers dressed in police gear used their patrol car to block the entrance of a gas station — where the defendant stood with a group of other young men — and then “jumped out” of their vehicle to confront them. 491 F.3d at 461-62.
Yet our case law’s stubborn mythology that consent is truly voluntary belies the all but foreordained nature of the resulting search. Individuals approached by the District’s Gun Recovery Unit officers know *791 they possess little more freedom than to elect the manner in which to be skewered upon Morton’s Fork.[2] The outcome is effectively predetermined. They will be searched. The choice they face is to “voluntarily” acquiesce to the officers’ request or to have any reaction to the officers’ inquiries — regardless of how objectively benign — serve as the factual predicate justifying a Terry search. See, e.g., Transcript of Motions Hearing at 80, United States v. Gross (finding articulable facts warranting Officer Katz’s search of Gross, who looked to the rear after noticing the officers and failed to completely comply with a request that he voluntarily show his waistband, lifting only part of his shirt).
With the guise of voluntary consent stripped away, the reality of the District’s regime is revealed. It is a rolling roadblock that sweeps citizens up at random and subjects them to undesired police interactions culminating in a search of their persons and effects. If the Fourth Amendment is intended to offer meaningful protection in the context of Terry stops, the voluntary consent exemption cannot be used to engage with members of the public en masse and at random to fabricate articulable suspicions for virtually every citizen officers encounter on patrol.
“No right is held more sacred, or is more carefully guarded ... than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.” Terry, 392 U.S. at 9, 88 S.Ct. 1868. Our precedents, however, fail to safeguard this fundamental right, and instead permits encounters intended to coerce “consented” searches and justify Terry stops through purposive interpretation of citizens’ reactions to “voluntary” questioning.
Persons questioned by the District’s Gun Recovery Unit patrols may reasonably be at a loss as to how to react to these contacts. Is there a means to react to such nominally voluntary encounters that might preserve their constitutional prerogatives? I offer this advice: speak to officers firmly, politely, respectfully. Tell them, “I do not wish to have an encounter with the police right now. Am I free to leave?” If the answer is “no,” then coercion will cease to masquerade as consent. Our courts will be forced, at last, to directly grapple with the reality of the District’s policy of routinized and involuntary seizures.

. The act of refusal itself dhes not, however, form the basis of the justification. See Illinois v. Wardlow, 528 U.S. 119, 125, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) ("[Rjefusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a ... seizure.”).

. Morton’s Fork derives from “Archbishop of Canterbury, Cardinal, and Minister of Henry VII John Morton’s (supposed) method of levying forced loans by arguing that those who were obviously rich could afford to pay, and those who lived frugally must have amassed savings. Hence in extended and allusive use it is: a practical dilemma, especially one in which both of the choices ... available disadvantage or discredit the chooser.” United States v. Johnson, 482 Fed.Appx. 137, 145 n. 14 (6th Cir.2012) (internal punctuation marks and citations omitted).